1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

JULIE KAY HATCH,

7                              Plaintiff,

8          v.

9  NANCY A. BERRYHILL, Deputy

10 Commissioner of Social Security for Operations,

11                              Defendant.

Case No. 2:17-cv-01264-RSL-TLF

REPORT AND
RECOMMENDATION

Noted for <u>May 4, 2018</u>

12
13      Julie Kay Hatch has brought this matter for judicial review of defendant's denial of her

14 applications for disability insurance and supplemental security income (SSI) benefits. This

15 matter has been referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v.*

16 *Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4). Ms. Hatch

17 seeks reversal of the ALJ's decision and requests a remand for an award of benefits or,

18 alternatively, for further administrative proceedings.

19      Ms. Hatch contends that the ALJ misapplied the law and lacked substantial evidence for

20 the decision to deny benefits. Specifically, she argues that the ALJ erred by discounting the

21 opinions of certain medical doctors and by finding that Ms. Hatch's reports of severe limitations

22 due to pain and other symptoms were not credible. The undersigned recommends that the ALJ's

23 decision should be reversed and remanded for an award of benefits.

24
25
26

REPORT AND RECOMMENDATION - 1

# I. <u>BACKGROUND</u>

Ms. Hatch filed applications for Social Security Benefits on April 6, 2012, alleging that her disability onset date was December 31, 1999. Dkt. 9, Administrative Record (AR) 230-38, 239-48 (Title II application for period of disability and disability insurance benefits, and Title XVI application for supplemental security income). Her claim was based on a long history of degenerative back disease and injury. *E.g.*, AR 274, 341-44, 665-68, 677, 725, 747-48, 932-43, 993, 1009-1142. She also based her claim for benefits on long-term psychiatric disorders and fibromyalgia. *E.g.,* AR 274, 294, 1262. Her claim for benefits was initially denied, and reconsideration was also denied. AR 1-6, 12-26. A hearing was held before an administrative law judge (ALJ), AR 33-49, and on August 16, 2013, the ALJ found Ms. Hatch not to be disabled. AR 15-26, 768.

Ms. Hatch sought judicial review, and pursuant to a stipulation by the Commissioner, the Court remanded for additional proceedings. The Court directed the ALJ to "reevaluate the medical opinions of record and include the credited limitations in the residual functional capacity," then determine at steps four and five of the sequential evaluation process whether Ms. Hatch was disabled. AR 815-16, 819-21.

At the second hearing on May 3, 2016, Ms. Hatch and a vocational expert appeared and testified. AR 790-814. The ALJ determined that Ms. Hatch suffers from the following severe impairments: "cervical and lumbar spine degenerative disc disease, fibromyalgia, obesity, pain disorder, depressive disorder, posttraumatic stress disorder, anxiety disorder, and substance use disorder (by history)." AR 770. The ALJ decided that even with the impairments and symptoms that were reflected in the medical records and in testimony, Ms. Hatch could still perform certain types of "sedentary work," including jobs as a document preparer, bench hand, and table worker

REPORT AND RECOMMENDATION - 2

that exist in significant numbers in the national economy. AR 770-82. The ALJ therefore found

that Ms. Hatch was not disabled. AR 765-82 (ALJ decision dated July 15, 2016). The Appeals

Council denied Ms. Hatch's request for review on August 4, 2017, making the ALJ's decision

the final decision of the Commissioner. AR 759. Ms. Hatch seeks judicial review of that

decision. Dkt. 4; 20 C.F.R. §§ 404.981, 416.1481.

## II.  STANDARD OF REVIEW AND SCOPE OF REVIEW

The Commissioner employs a five-step "sequential evaluation process" to determine

whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. If the ALJ finds the claimant

disabled or not disabled at any particular step, the ALJ makes the disability determination at that

step and the sequential evaluation process ends. *See id.*

The five steps are a set of criteria by which the ALJ considers: (1) Does the claimant

presently work in substantial gainful activity? (2) Is the claimant's impairment (or combination

of impairments) severe? (3) Does the claimant's impairment (or combination) equal or meet an

impairment that is listed in the regulations? (4) Does the claimant have Residual Functional

Capacity (RFC), and if so, does this RFC show that the complainant would be able to perform

relevant work that he or she has done in the past? And (5) if the claimant cannot perform

previous work, are there significant numbers of jobs that exist in the national economy that the

complainant nevertheless would be able to perform in the future? *Keyser v. Comm'r of Soc. Sec.*

*Admin.,* 648 F.3d 721, 724-25 (9th Cir. 2011).

The Court must consider the administrative record as a whole. *Garrison v. Colvin,* 759

F.3d 995, 1009-10 (9th Cir. 2014). The Court is required to weigh both the evidence that

supports, and evidence that does not support, the ALJ's conclusion. *Id.* The Court reviews "only

REPORT AND RECOMMENDATION - 3

the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id.* at 1010.

The Court will uphold an ALJ's decision unless: (1) the decision is based on legal error; or (2) the decision is not supported by substantial evidence. *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). This requires "'more than a mere scintilla,'" though "'less than a preponderance'" of the evidence. *Id.* (quoting *Desrosiers*, 846 F.2d at 576). If more than one rational interpretation can be drawn from the evidence, then the Court must uphold the ALJ's interpretation. *Revels,* 874 F.3d at 654. The Court may not affirm by locating a quantum of supporting evidence and ignoring the non-supporting evidence. *Id.*

### III. THE ALJ'S STEP TWO FINDING

Ms. Hatch contends that the ALJ erred at step two because the ALJ did not make a finding that Ms. Hatch suffers from radiculopathy as a severe impairment. At step two of the sequential evaluation process, the ALJ must determine whether an impairment is "severe." 20 C.F.R. § 416.920. The step two inquiry is a *de minimis* screening device used to dispose of groundless claims. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). An impairment is not severe if the evidence establishes only a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." SSR 85-28, 1985 WL 56856, at *3; *Smolen*, at 1290; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988).

The Ninth Circuit has emphasized that this inquiry "is not meant to identify the impairments that should be taken into account when determining the RFC." *Buck v. Berryhill*,

REPORT AND RECOMMENDATION - 4

1    869 F.3d 1040, 1048-49 (9th Cir. 2017) (rejecting claim that ALJ erred after second hearing,

2    where ALJ found new severe impairments but did not change RFC). The court noted that an ALJ

3    assessing a claimant's RFC before steps four and five "must consider limitations and restrictions

4    imposed by all of an individual's impairments, even those that are not 'severe.'" *Buck*, 869 F.3d

5    at 1049 (citing Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, Social

6    Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996)).

7

8        Thus, the RFC "should be exactly the same regardless of whether certain impairments are

9    considered 'severe' or not" at step two. *Buck*, 869 F.3d at 1049. The Ninth Circuit concluded that

10   because the ALJ decided step two in the claimant's favor and was required to consider all

11   impairments in the RFC, whether "severe" or not, "[a]ny alleged error is therefore harmless and

12   cannot be the basis for a remand." *Id.* (citing *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir.

13   2012)).

14

15       The same is true here. Because the ALJ decided step two in Ms. Hatch's favor, the ALJ

16   was required to consider evidence of any and all impairments, including radiculopathy, in

17   assessing Ms. Hatch's RFC. *See Buck*, 869 F.3d at 1049.

18       Ms. Hatch misinterprets this Court's stipulated order remanding her prior appeal. The

19   Court remanded for a de novo hearing and re-evaluation of the medical opinion evidence. AR

20   822. It did not, as Ms. Hatch contends, state that it was remanding "because [the ALJ] had not

21   properly considered and determined all of Plaintiff's severe impairments, such as radiculopathy /

22   neuropathy . . . ." Dkt. 11, p. 4. Ms. Hatch's contention that the ALJ erred in failing to consider

23   and incorporate evidence of impairments from radiculopathy into Ms. Hatch's RFC is addressed

24   below.

25

26

REPORT AND RECOMMENDATION - 5

IV.  <u>THE ALJ'S CONSIDERATION OF THE MEDICAL EVIDENCE</u>

Ms. Hatch asserts that the ALJ committed legal error by not adequately analyzing the medical record. She contends that the ALJ did not have sufficient evidence and reasons to reject or discount the medical opinions of treating physician Thang C. Do, M.D., and examining physician Mark Heilbrunn, M.D. The Court should hold that the ALJ committed error by misapplying the law and overlooking or misapprehending the evidence of complicated, overlapping and severely limiting symptoms caused by multiple long-term medical and psychological conditions. Those conditions included extreme and sustained pain and inability to concentrate as a result of fibromyalgia and back problems including lumbar and cervical degenerative disc disease, as well as fluctuating yet consistently debilitating long-term mental illnesses.

The ALJ erred by rejecting the opinions of Ms. Hatch's treating and examining physicians when evaluating her RFC. The longitudinal record contains overwhelming evidence that the overlapping conditions severely limited Ms. Hatch's ability to concentrate, sit, stand, or maintain focus for the length of time that would be required to perform even sedentary work. In addition, because the ALJ also failed to correctly apply the law, and lacked substantial evidence in determining that Ms. Hatch's testimony lacked credibility regarding the severity of symptoms and the extent of physical and mental limitations caused by those symptoms, the Court should reverse and remand for an award of benefits.

The Court must consider the administrative record as a whole. *Garrison v. Colvin,* 759 F.3d 995, 1009-10 (9th Cir. 2014). "The medical opinion of a claimant's treating doctor is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the claimants] case record.'" *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). To reject the uncontradicted opinion of either a treating or examining physician, an ALJ must provide clear and convincing reasons. *Id.* The ALJ must support his or her decision to reject the treating physician's opinion with "specific, cogent reasons." *Id.* To do so, the ALJ sets out "a detailed and thorough summary of the facts and conflicting clinical evidence," interprets that evidence, and makes findings. *Id.*

When other evidence contradicts the treating or examining physician's opinion, the ALJ must still provide "specific and legitimate reasons" to reject that opinion. *Revels,* 874 F.3d at 654. "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Id.* (quoting *Magallanes,* 881 F.2d at 751). In either case, the ALJ's reasons must be supported by substantial evidence in the record. *Lester v. Chater,* 81 F.3d 821, 830-31 (9th Cir. 1995).

In this case, the ALJ determined that Ms. Hatch does not have an impairment or combination of impairments that meets the criteria of an impairment listed in the regulations. AR 772; *see* 20 C.F.R. §§ 404.1520(d), 416.920(d), 416.925, 416.926. Ms. Hatch does not directly challenge this step three determination.[1]

The ALJ performed an assessment of the medical evidence to evaluate Ms. Hatch's residual functional capacity (RFC). The Commissioner uses a claimant's RFC assessment at steps four and five to determine whether he or she can perform his or her past relevant work and whether he or she can do other work. SSR 96-8p, 1996 WL 374184, at *2. The RFC is what the

---

[1] Ms. Hatch asserts that because the ALJ erred in not finding radiculopathy to be "severe" at step two, the ALJ erred at step three by failing to consider whether that condition met or medically equaled a listed condition. Dkt. 11, p. 11; *see* C.F.R. § 404.1520(d). Ms. Hatch's only attempt to show that her radiculopathy met or medically equaled a listing is in citing Dr. Do's form opinion to that effect. Dkt. 11, p. 11; *see* AR 571. Her briefing does not analyze the step three evidence, and so it does not directly raise the issue.

REPORT AND RECOMMENDATION - 7

claimant "can still do despite his or her limitations." *Id.* The ALJ based his assessment of Ms.

Hatch's RFC on a review of the medical evidence, and Ms. Hatch's own testimony. AR 24-33.

The ALJ found that Ms. Hatch had the RFC:

**to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally reach overhead with the right dominate [sic] upper extremity and has no limitation bilaterally to reach in all other directions; she can push and pull with the right upper extremity frequently and the left upper extremity continuously; she has no limitations with bilateral handling, fingering, and feeling; she has no limitation in her feet for foot controls; there are no significant environmental limits to performance of sedentary work in an air conditioned work environment; she can perform simple, routine tasks and follow short, simple instructions; she can do work that needs little or no judgment; she can perform simple duties that can be learned on the job in a short period of less than 30 days; she can respond to supervision and coworkers; she can deal with occasional changes in the work environment; and she has some difficulty working directly with the public but could work in jobs that required only occasional exposure to or interaction with the general public.**

AR 774 (emphasis in original).

The ALJ determined at step four that Ms. Hatch has no "past relevant work." AR 781.

Ms. Hatch does not challenge that finding.

Finally, the vocational expert testified that a person with Ms. Hatch's RFC could work as

a document preparer, bench hand, or table worker. AR 810-11. Based on that testimony, the ALJ

found Ms. Hatch not disabled at step five. AR 781.

A.   The ALJ's Consideration of Evidence of Radiculopathy

Ms. Hatch contends that the ALJ erred by failing to consider objective evidence that

shows she suffers from radiculopathy, which she alleges is connected to her back condition. In

contending the ALJ ignored evidence of radiculopathy, Ms. Hatch also relies on her hearing

testimony about limitations from numbness in her hands, arms, and legs, and in moving her head.

*See* AR 796-800.

REPORT AND RECOMMENDATION - 8

The ALJ found that cervical and lumbar spine degenerative disc disease is a severe impairment and considered its effects in assessing Ms. Hatch's RFC. The ALJ limited Ms. Hatch to sedentary work with additional limitations. AR 774.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(b).

Thus, "[t]he decision reflects that the ALJ considered any limitations posed by the [radiculopathy] at Step 4." *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Accordingly, the ALJ's failure to identify evidence of radiculopathy as a distinct condition is not a separate source of reversible error. Because the ALJ was required to consider all impairments in the RFC, and the record shows that radiculopathy is intimately connected to Ms. Hatch's degenerative disc disease, "[a]ny alleged error is therefore harmless and cannot be the basis for a remand." *Id.* (citing *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)).

B.    Treating Physician: Thang C. Do, M.D.

Ms. Hatch next asserts that the ALJ gave inadequate reasons for discounting Dr. Do's opinions about her limitations. Regardless of whether the Court applies the clear and convincing, or the specific and legitimate, standard of review for the reasons given by the ALJ, the Court should hold that the ALJ committed error by failing to consider the record as a whole, and by failing to give appropriate deference to Dr. Do as Ms. Hatch's treating physician.

Dr. Do is a treating physician for Ms. Hatch, and has been her doctor since 2011. AR 601. In February 2013, Dr. Do completed several interrogatory forms on Ms. Hatch's conditions,

REPORT AND RECOMMENDATION - 9

both mental and physical. Dr. Do opined that Ms. Hatch "was markedly limited by chronic pain, peripheral neuropathy, depression, anxiety, PTSD, and personality disorder" and "that she was precluded from effective functioning at any vocation." AR 779 (citing AR 568-81).

In April 2013, Dr. Do stated in a letter that Ms. Hatch's conditions include "major depressive disorder—recurrent, severe; generalized anxiety disorder; and panic disorder, as well as, fibromyalgia; degenerative joint disease; neck and back pain with radiculopathy; chronic headaches; fatigue; and insomnia." AR 601. He opined that "these disorders existed prior to 2007, and could reasonably be expected to have produced mood and anxiety symptoms, difficulty with ambulation, pain, and fatigue of such severity that [Ms. Hatch] was precluded from working from 2007 through the present date." *Id.* He stated that he based this opinion on his examinations of Ms. Hatch and a review of medical records from before he became her doctor in 2011. *Id.*

The ALJ gave these opinions "little weight" and relied on two reasons: that the opinions "conflict with [Dr. Do's] own treatment notes, which showed that [Ms. Hatch's] mental health improved with treatment;" and that Dr. Do's "opinions also conflict with [Ms. Hatch's] statements that she is able to prepare meals, do household chores, drive, and shop in stores once per week." AR 779 (citing AR 295-97, 593).

Ms. Hatch asserts that the ALJ needed to give clear and convincing reasons to reject Dr. Do's opinions. The ALJ noted that several doctors stated that Ms. Hatch's conditions were not as severe as Dr. Do's opinions reflect. *See* AR 777-78 (according "significant weight" to reviewing opinion of Robert Hoskins, M.D., "some weight" to examining opinion of Brian Snitily, M.D., and "significant weight" to reviewing physicians John Robinson, Ph.D., and Matthew Comrie, Psy.D.). However, there is insufficient evidence to support this assessment by the ALJ. The

REPORT AND RECOMMENDATION - 10

medical opinions relied upon by the ALJ as being contradictory were analyzed in a conclusory

manner by the ALJ. *See Garrison,* 759 F.3d at 1012-13 (an ALJ may not manufacture a conflict

between the treating physician's opinions and other medical opinions; the ALJ is required to set

forth his or her own interpretations, explain why one medical opinion is more credible than

another, and do more than using boilerplate language to criticize the treating physician's reports

and opinions).

Taken as a whole, Dr. Do's assessment of Ms. Hatch is consistent with the longitudinal

medical record from December 31, 1999, to February 2016. The record shows that Ms. Hatch

was experiencing fluctuating symptoms, but overall her pain level and mental illness remained

severe and substantially interfered with her physical ability to sit or stand and with her ability to

concentrate. AR 341-94, 665-68, 675-79, 725-34, 743-48, 932-43, 1069-1134, 1262; *see also* AR

657-59 (Dr. Lawrence, M.D.); AR 698-701 (Division of Vocational Rehabilitation); AR 705-21

(Dr. Susan Hakeman, M.D.).

In December 2013, Dr. Do wrote that she was "Staying up late, stressed . . . Severe

anxiety, mood lability. Sleep is difficult." AR 1059. In a mental status exam, Dr. Do marked that

Ms. Hatch had an anxious affect and depressed mood." *Id.* The next month, Dr. Do wrote,

"Moods stressed. . . . Energy and motivation still low. Poor focus . . ." AR 1052. About a month

later, Dr. Do wrote "Julie feels a difference since starting Venlafaxine-ER. Her moods are lifting

and she is not as anxious. Her pain is stable, and she feels her meds are providing an improved

quality of life, and a higher degree of functioning." AR 1048. In April and June 2014, Dr. Do

wrote: "Moods are generally less depressed," and "not as anxious since starting Venlafaxine."

AR 1040, 1044. From October 2014 until the most recent of his notes in the record, dated

February 2016, Dr. Do wrote: "focus and concentration are becoming more difficult;" "mood is

REPORT AND RECOMMENDATION - 11

stable on Venlafaxine;" and "anxiety is still high" but "diazepam helps." AR 993, 1003, 1007, 1016, 1021, 1024, 1028, 1032.

Dr. Do opined that, among other limitations: Ms. Hatch has marked difficulty in social functioning and marked deficiencies of concentration, persistence or pace; due to depression, Ms. Hatch suffers anhedonia or pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide; also due to depression, Ms. Hatch has "extreme" restriction of activities of daily living and difficulty maintaining social functioning and repeated extended episodes of decompensation; generalized persistent anxiety; recurrent severe panic attacks; recurrent and intrusive recollections of traumatic experiences; and more. AR 570, 572-76.

All of Dr. Do's treatment notes and opinions are consistent with the severe conditions and symptoms reported by doctors and other treatment providers. The Court may draw reasonable inferences from the record, which shows that differences in symptoms from one appointment to the next are indicative minor fluctuations in Ms. Hatch's day-to-day experiences of pain and numbness from ongoing back conditions, mental health highs and lows, and chronic pain and fatigue from fibromyalgia, rather than a material change in condition or symptoms. The ALJ misapplied the law by omitting the deference that is properly given to a treating physician. "The medical opinion of a claimant's treating doctor is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimants] case record.'" *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017), *quoting* 20 C.F.R. § 404.1527(c)(2). The medical

REPORT AND RECOMMENDATION - 12

record in Ms. Hatch's case supports Dr. Do's assessment, and therefore the ALJ erred by not giving it controlling weight.

C.     Examining Opinion: Mark Heilbrunn, M.D.

Ms. Hatch also challenges the ALJ's rejection of Dr. Heilbrunn's opinions. The Court should hold that the ALJ gave legally insufficient reasons for rejecting those opinions.

Dr. Heilbrunn conducted a physical exam of Ms. Hatch in October 2012. AR 531-37. He reviewed Ms. Hatch's medical records, including a 2005 lumbar spine x-ray, a 2011 rheumatology report, and a 2011 cervical spine MRI. AR 531. He also interviewed Ms. Hatch and conducted a physical examination.

He found posterior tenderness and decreased range of motion in the neck, with "[p]ain radiating to both superior trapezii." AR 533. He found edema and stasis in the lower extremities. AR 534. He found normal gait and normal station while sitting, along with normal hand coordination. *Id.* In the back, he found lumbar lordosis and "tenderness in the midline and paraspinous areas." *Id.* In the hips, he found full internal and external rotation without pain or crepitus, but in the knees he found bilateral crepitus. *Id.* He found "decreased sensation in the left S1 dermatome," but otherwise normal sensations. *Id.* He apparently found limited ranges of motion in the back and hip joints. AR 535. Dr. Heilbrunn diagnosed Ms. Hatch with several conditions, including: "Lumbar left radiculopathy, status post two discectomies;" "Cervical degenerative disc disease with pain radiating to the superior trapezii;" "Bilateral knee osteoarthritis;" and "Bilateral hip degenerative joint disease." *Id.*

Dr. Heilbrunn also opined that Ms. Hatch "could be expected to sit for at least 30 minutes uninterrupted, as manifested in the examination, and has a maximum sitting capacity of 4 to 5 out of 8 hours, with limitations justified by bilateral hip degenerative joint disease and

REPORT AND RECOMMENDATION - 13

lumbar degenerative disc disease." AR 536. He further opined that Ms. Hatch "would be able to stand/walk for 10 minutes uninterrupted, as in the examination and has a maximum standing/walking capacity of 4 out of 8 hours, with limitation justified by bilateral knee osteoarthritis, lower extremity venous insufficiency and lumbar left radiculopathy." *Id.* He also opined that Ms. Hatch would be "limited in the use of her arms," though not in "above and below shoulder level reaching," that she "would have limitations in operating foot controls with either foot," and that a "marked decrease in cervical range of motion will limit activities in sedentary position." *Id.*

The ALJ gave "little weight" to Dr. Heilbrunn's opinions that Ms. Hatch was limited to sitting four hours per day due in part to hip degenerative joint disease and to standing or walking for 10 minutes at a time in part due to knee osteoarthritis. AR 777. The ALJ explained, citing his discussion of Dr. Heilbrunn's opinion at step three, that Ms. Hatch "does not have any medically determinable hip impairment." *Id.*

In that discussion, the ALJ found that, contrary to Dr. Heilbrunn's finding, bilateral knee osteoarthritis and bilateral hip degenerative joint disease were not medically determinable impairments because they were not supported by objective evidence. AR 771; *see* AR 534-35. The ALJ also explained that Dr. Heilbrunn's "opinion conflicts with the evidence, including the results of his own exam showing negative knee and hip results." AR 777; *see* AR 534. And the ALJ stated that Dr. Heilbrunn's opinion is "inconsistent with [Ms. Hatch's] statement that she walks for exercise and cares for her children." AR 777 (citing AR 296, 472).

These were inadequate reasons for rejecting Dr. Heilbrunn's opinion, and the ALJ's analysis of the evidence as to Dr. Heilbrunn's assessment of Ms. Hatch's condition is incomplete. Dr. Heilbrunn also based his assessment of Ms. Hatch's sitting limitations on her

REPORT AND RECOMMENDATION - 14

lumbar degenerative disc disease and her standing/walking limitations on her "lower extremity venous insufficiency and lumbar left radiculopathy." AR 536. The ALJ did not find that those conditions were unsupported. Therefore, the ALJ's first reason cannot support his decision to discount all of Dr. Heilbrunn's opinion. *Cf. Dale v. Colvin*, 823 F.3d 941, 945 (9th Cir. 2016) ("[A]n ALJ errs when he discounts an other source's entire testimony because of inconsistency with evidence in the record, when the ALJ has divided the testimony into distinct parts and determined that only one part of the testimony is inconsistent."). The ALJ erred unless his other reason for discounting Dr. Heilbrunn's opinions was specific and legitimate and supported by the record.

That reason—that the opined limitations were inconsistent with Ms. Hatch's activities during the period—is likewise not specific or supported. The record contains stray references to Ms. Hatch's activities: that when she had one-year-old twins "she had to pick them up often" while "tr[ying] to use good body mechanics;" that she "tried to increase her walking" despite back pain; that she fell on a trail while holding her two-year-old daughter; that she was injured while feeding horses with her children; and that later she was "attempting to continue with ADLs and exercise," including walking daily and starting Pilates, but that "this has been decreased due to pain." AR 340, 470, 478, 682.

Ms. Hatch also stated in a 2012 function report that, with help from her mother and husband, she arranged to make sure her twins were transported to and from school, supervised their hygiene and getting dressed, and took care of them or arranged for their care. AR 296. The record does not contain information about the physical requirements, frequency, or duration of these activities, and the ALJ did not attempt to develop a record to answer those questions.

REPORT AND RECOMMENDATION - 15

"Absent specific details" on Ms. Hatch's childcare and other activities, the ALJ improperly relied on them to reject Dr. Heilbrunn's opinion. *See Trevizo*, 871 F.3d at 676.

Ms. Hatch contends that the ALJ's error was not harmless because the ALJ discounted not only Dr. Heilbrunn's opinions on Ms. Hatch's sitting and standing/walking abilities but his opinion as a whole, including limitations on foot controls and other abilities. Dkt. 16, p. 9. Ms. Hatch points out that such limitations are not part of the RFC. *Id.*

The Court must consider the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017). Because the ALJ's error in rejecting Dr. Heilbrunn's opinion was not harmless, the Court should reverse based on the ALJ's discussion of the medical opinion evidence, as well as the ALJ's error in considering Ms. Hatch's testimony concerning her symptoms.

## V.   THE ALJ'S CONSIDERATION OF MS. HATCH'S TESTIMONY

Ms. Hatch also asserts that the ALJ erred in discounting her subjective symptom testimony. Dkt. 11, pp. 17-18.

The United States Court of Appeals for the Ninth Circuit uses a two-step inquiry for determining whether and to what extent the claimant's testimony about severity of symptoms must be credited:

- First, has the claimant presented objective medical evidence of an impairment that reasonably could produce the pain or other symptoms alleged? The claimant is not required to show that the impairment could reasonably be expected to result in the exact severity of symptoms that the claimant alleges; the claimant is only required

to show that the impairment could reasonably have caused some degree of the symptoms. The claimant is not required to produce objective medical evidence of the specific symptoms (for example, pain) or the severity thereof.

- Second, if the first step is satisfied and there is no evidence of malingering, then the Court asks: has the ALJ provided clear and convincing reasons for rejecting the claimant's testimony about the severity of symptoms?

*Trevizo v. Berryhill,* 871 F.3d 664, 678 (9th Cir. 2017).

There is ample evidence to show that the answer to the first part of this test is "yes." The record shows that Ms. Hatch had an L4-L5 partial hemilaminotomy and microdiscectomy surgery at Saint Joseph's Hospital on March 28, 2000. AR 662-69. The purpose of this surgery was to address back and hip pain, and to correct her inability to function as a result of the pain from a long-term L4 and L5 disc herniation that caused pain in her back and radiculopathy into the hip and leg. Exacerbation and different manifestations of this condition occurred after Ms. Hatch was in an automobile accident on December 11, 1999. AR 662-64 (opinion of surgeon who performed procedure, Michael S. Lawrence, M.D.). Although she obtained some relief from back pain at first, the record shows that her painful symptoms returned and that she also experienced severe mental illness, addiction, and symptoms showing deteriorating mental health. AR 657-59 (Dr. Lawrence, M.D.); AR 698-701 (Division of Vocational Rehabilitation); AR 705-21 (Dr. Susan Hakeman, M.D.).

Ms. Hatch experienced more acute back pain in 2005, after she gave birth to twin daughters. AR 652 (Dr. Lawrence). "Three weeks ago [in June of 2005] she was lifting a baby out of the crib and had pain in the back and going down the left leg." *Id.* An MRI of Ms. Hatch's spine on July 6, 2005 showed "a very large left posterior disc extrusion measuring 8 x 14 mm. . .

REPORT AND RECOMMENDATION - 17

. Left lateral stenosis is graded as high." AR 377.

The diagnostic report from the MRI stated: "At L5-S1, there is a very large left posterior disc extrusion with imaging findings suggestive of compression of the left S1 nerve root and sleeve." AR 378 (David G. Ashley, M.D.). On July 18, 2005, Ms. Hatch "underwent a left L5-S1 partial hemilaminotomy with microdiskectomy and lateral recess decompression." AR 646 (Dr. Lawrence). The reason for this surgery was to address extreme back pain with radiculopathy causing pain in the leg resulting from "a very large disk herniation on the left at L5-S1 compressing the S-1 nerve root. Disk space narrowing is present at L4-L5." AR 653 (Dr. Lawrence).

Between the July 2005 surgery and 2016 when she appeared for the second administrative hearing, Ms. Hatch continued to experience severe back pain and radiculopathy. AR 347-60 (reports of doctors at Saint Joseph Medical Center); AR 632-37 (Dr. Danahy and Dr. Patterson, records dated August–October 2005); AR 725 (Dr. Hillard treatment notes, 2006); AR 488 (ARNP Kopanos treatment notes, 2011); AR 481 (2012 pain clinic referral); AR 294-95 (2012 function report); AR 502, 505, 508, 518, 599 (Dr. Do treatment notes, 2011-2012); AR 601 (Dr. Do letter, 2013); AR 745 ("urgent referral" for back pain in 2013); AR 797-800 (2016 hearing testimony).

At the same time that she was experiencing back and leg pain, Ms. Hatch was diagnosed and treated with medication for fibromyalgia, depression, anxiety disorder and panic attacks, post-traumatic stress disorder, and agoraphobia, and she received in-patient and out-patient treatment for opioid dependency and alcohol abuse. *See* AR 347, 488-89, 502, 505, 508.

Ms. Hatch testified during the administrative hearings that she takes naps for a few hours during the day due to chronic fatigue, and she is in a lot of pain due to fibromyalgia symptoms

REPORT AND RECOMMENDATION - 18

that she experiences throughout her body. AR 796. She explained to the ALJ that the pain is

significant in her lower back as well as her hips and legs; she has non-epileptic episodes where

she loses time and memory due to stress, she gets confused easily when she feels pressure; she

cannot stand for even one hour, the pain is significant when she is sitting and she cannot sit for

two hours at a time; she has difficulty using her hands because of numbness and arm pain; she

has difficulty looking up or down because of neck pain, and she has no ability to mentally focus

or concentrate because of the extreme pain. AR 39-44, 796-800. The ALJ discounted Ms.

Hatch's statements about the severity of her symptoms. AR 774-77.

Reviewing Ms. Hatch's treatment history and results of MRIs and examinations, the ALJ

found that Ms. Hatch's testimony about her lower back pain was "out of proportion to the

objective evidence." AR 775. The ALJ then found that Ms. Hatch "did not follow through with

treatment recommendations for her chronic pain," and in particular that "there is no evidence that

she attended physical therapy" after she was referred to it in 2012. AR 775-76.

The ALJ reasoned that "[i]f her pain symptoms were as significant as alleged, it is

reasonable to expect her to [have] followed through with treatment recommended by both Dr.

Richardson and Dr. Ouellette to reduce her symptoms." AR 776. Finally, the ALJ found that the

daily activities Ms. Hatch reported "are inconsistent with the degree of pain she has alleged." *Id.*

Ms. Hatch contends that the ALJ erred in not considering all of the impairments that

might cause her pain, such as radiculopathy and neuropathy. She also contends the ALJ did not

"discuss all of the objective medical evidence" that supported her testimony that she had

difficulty sitting and numbness and pain in her hands and arms, in particular MRI results from

2013 and 2016. *See* AR 747-48, 1117 (2013 MRI); *see also* AR 1069, 1079 (2016 MRI).

The ALJ's reliance on Ms. Hatch's activities does not provide a clear and convincing

REPORT AND RECOMMENDATION - 19

reason to discount Ms. Hatch's testimony about the severity of her pain. The ALJ cited Ms. Hatch's ability to supervise her two children getting ready for school, prepare their meals, and get them to school; swim, walk for exercise, and start Pilates; drive; shop for food; and attend Bible study, NA, and AA meetings. AR 776. The record does not contain information about the physical requirements, frequency, or duration of these activities. As in *Trevizo v. Berryhill*, "the mere fact that [Ms. Hatch] cares for small children does not constitute an adequately specific conflict with her reported limitations." 871 F.3d 664, 682 (9th Cir. 2017).

Ms. Hatch's efforts to walk, swim, and attend Pilates are also insufficient reasons for the ALJ to find that her testimony about pain was not credible. Although at one point Ms. Hatch reported exercising every day, AR 472, the record contains few references to her exercise or details about the gentleness or aggressiveness of exercise. Therefore it was error for the ALJ to suggest that it was incompatible with the severity of pain about which she testified. *See also Reddick*, 157 F.3d at 722 (noting "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations"). Thus, the ALJ's third reason for rejecting Ms. Hatch's testimony was not clear and convincing or supported.

The ALJ's finding that Ms. Hatch did not follow up on prescribed treatment is somewhat supported by the record, but it does not provide a clear and convincing reason to reject her credibility concerning the extent of pain and the severity of functional limitations caused by her medical and psychological conditions.

> A claimant's subjective symptom testimony may be undermined by "an unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment. While there are any number of good reasons for not doing so, a claimant's failure to assert one, or a finding by the ALJ that the profferred [sic] reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony."

*Trevizo*, 871 F.3d at 679 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see* SSR

REPORT AND RECOMMENDATION - 20

1  96-7p, 1996 WL 374186, at *7 (claimant's statements "may be less credible if . . . the individual

2  is not following the treatment as prescribed . . .").

3        If the claimant had cause for not complying with treatment recommendations, failure to

4  follow up with certain treatment referrals is not a clear and convincing reason to discount the

5  claimant's testimony. *Byrnes v. Shalala,* 60 F.3d 639, 641 (9th Cir. 1995). In addition, if there is

6  not substantial evidence to show that the claimant could reasonably remedy the condition with

7  the treatment at issue—i.e., if the claimant had followed the recommended course of treatment,

8  the condition was reasonably remediable and likely would have been resolved because of the

9  efficacy of that treatment as to the particular claimant—then there is not clear and convincing

10  evidence to discount the claimant's testimony. *Id.*

11

12        Considering the record as a whole, this reason is not a clear and convincing basis for

13  discounting Ms. Hatch's testimony about the severity of her symptoms and the extent to which

14  those symptoms limit her functioning. Apparently the ALJ did not request an expert consultation

15  from a physical therapist, and the hearing transcripts show that the ALJ did not ask Ms. Hatch to

16  explain the circumstances of her decisions about whether to follow up on the referrals to physical

17  therapy. AR 33-49 (2013 hearing); AR 790-814 (2016 hearing).

18

19        The record contains evidence from which the Court may infer that Ms. Hatch had

20  credible reasons for not pursuing physical therapy. On December 13, 2005, Dr. Tracy Ouellette,

21  M.D. observed that Ms. Hatch "was referred to PT after the second surgery but was not able to

22  tolerate the activities." AR 341. Dr. Ouellette also noted that Ms. Hatch "tried some gentle

23  stretching exercises but she is quite fearful of reinjury. [Ms. Hatch] describes 8/10 constant low

24  back pain, numbness in the left posterior thigh and foot. Her pain is worse with standing and

25  walking. It is best with lying down and it is difficult for her to sit if she can't put her feet on the

26

REPORT AND RECOMMENDATION - 21

ground. She has difficulty with housework and with lifting her young children." AR 342. Dr. Ouellette recommended outpatient rehabilitation pool therapy, and made a referral on December 13, 2005. *Id.*

On February 2, 2006, Dr. Ouellette noted that "[Ms. Hatch] can't afford hydrotherapy but would like to sign up for a water aerobics class at the Y." AR 640. On May 1, 2006, Dr. Ouellette made a physical therapy referral requesting a TENS unit and a stretching program; the record indicates that on May 4, 2006, no TENS unit had been obtained. AR 324, 331. Dr. Ouellette wrote,

> I gave [Ms. Hatch] a referral to PT to try a TENS unit and issue one for home use if effective. She may also try to borrow one from a friend, but I am unable to describe how to apply it appropriately, so I encouraged her to at least have one PT visit to learn to use it properly. I also asked if they would review her home exercise program and see if they could provide her with some additional stretches that might be helpful.

AR 332-33. Dr. Ouellette also noted that Ms. Hatch did not have insurance, and therefore Dr. Ouellette was trying to locate services, because Ms. Hatch was struggling to pay for her medical care out-of-pocket. AR 333.

On October 12, 2011, Dr. Do noted that: "[Ms. Hatch] was advised to start with stretching and some strength training exercises as recommended by her physical therapist." AR 512. The record shows a referral to a physical therapist in February 2012 by Brent Richardson, M.D., concerning a diagnosis of Cervical DDD, Cervicalgia, and Cervical Radiculitis. AR 496-97. Stephen J. Buetow, M.D., evaluated an MRI of Ms. Hatch's spine on March 27, 2013. AR 748. On April 2, 2013, it appears that Ms. Hatch had some type of insurance to assist with medical expenses. AR 731. The record shows that Ms. Hatch's back pain increased in the spring of 2013 and she lost control of her bladder, causing her to seek treatment with Dr. Hoekema and the University of Washington Medical Center. AR 745.

REPORT AND RECOMMENDATION - 22

1    It is unclear from the record after February 2012 whether some type of physical therapy,

2  at some point, did in fact occur. It also appears from the record that Ms. Hatch had great

3  difficulty paying for medical care. It is pure speculation whether any specific type of physical

4  therapy would have been affordable, physically possible, or whether there is any likelihood that

5  physical therapy would be effective for pain management or management of other symptoms

6  such as weakness, fatigue, and mental or emotional problems, considering the many conditions

7  that Ms. Hatch has been suffering from since 1999. She testified, and the medical records concur,

8  that she has had two back surgeries (in 2000 and 2005), experiences stabbing pains "like a poker

9  of hot heat" in her back so that she cannot sit for two hours at a time, AR 799, cannot stand for

10  an hour at a time, has fibromyalgia that causes an all-over ache everywhere, *id.*, has been taking

11  a number of medications for pain, physical discomfort, and mental conditions, AR 801, and the

12  severity of the pain causes her to not be able to concentrate or focus. AR 39-44, 801. Given the

13  overwhelming evidence of severely limiting physical and mental conditions suffered by Ms.

14  Hatch, any further development of the record as to physical therapy would not be useful.

## VI.  REMAND FOR AWARD OF BENEFITS

The Court may in its discretion remand this case "either for additional evidence and

findings or to award benefits." *Smolen*, 80 F.3d at 1292; *see Trevizo*, 871 F.3d at 682. If an ALJ

makes an error and there is uncertainty and ambiguity in the record, the district court should

remand to the agency for further proceedings. *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir.

2018). If the district court concludes that additional proceedings can remedy the errors that

occurred in the original hearing, the court should remand the case for further consideration.

*Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017).

REPORT AND RECOMMENDATION - 23

The Ninth Circuit has developed a three-step analysis for determining when to remand for a direct award of benefits. Such remand is generally proper only when all three of the following criteria are met:

- first, "the record has been fully developed and further administrative proceedings would serve no useful purpose;"

- second, "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion;" and

- third, "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."

*Trevizo*, 871 F.3d at 682-83 (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)).

In *Leon v. Berryhill*, the Ninth Circuit applied the "credit-as-true" rule by: first, asking whether the ALJ's reasons for rejecting the evidence were legally insufficient; second, asking whether there are any remaining issues that must be resolved before a disability determination can be made; and third, asking whether further administrative proceedings would be useful. 880 F.3d 1041, 1045 (9th Cir. 2018). The Ninth Circuit also confirmed in *Leon,* that even if, after considering all of those questions, it appears that a remand would be unnecessary, the district court still has discretion to remand for additional proceedings if, considering the record as a whole, there are reasons for serious doubt as to whether the claimant is disabled. *Id.*

As in *Trevizo*, the record of medical evidence in Ms. Hatch's case is extensive. *See* 871 F.3d at 683. A multitude of medical records from the beginning of the year 2000 to the date of the second administrative hearing in May of 2016 support and corroborate the assessments of Dr. Do and Dr. Heilbrunn, as discussed above. The ALJ failed to provide legally sufficient reasoning to reject these informed medical opinions of Dr. Do

REPORT AND RECOMMENDATION - 24

and Dr. Heilbrunn. Likewise, the ALJ failed to provide legally sufficient reasoning to discount the testimony of Ms. Hatch. If all of this testimony that was rejected by the ALJ is instead credited as true, there would be no point in remanding for another RFC determination. Crediting the testimony and medical evidence as true, a person such as Ms. Hatch—who needs to lie down and cannot stand or sit for a sustained amount of time, and due to mental illness is unable to concentrate effectively—would not be able to perform the sedentary jobs that were identified by the Vocational Expert. *See* AR 810-14 (V.E. testified that a person who cannot maintain consistent production pace and meet deadlines would not be able to sustain employment).

Further, there is no reason to doubt that Ms. Hatch has such serious physical and mental impediments to her level of functioning that she cannot be gainfully employed. Ms. Hatch's examinations, assessments, and testimony concerning the symptoms of her mental illnesses and pain from fibromyalgia, as well as degenerative disc disease, all point in one direction: Her ability to function has been severely diminished to the point where she lacks the ability to sustain mental concentration and cannot sit or stand for the length of time required to perform even sedentary jobs. *See Revels,* 874 F.3d at 669 ("Revels' testimony, her function reports, and the treatment notes from her doctors consistently show that she was suffering from severe pain.")

## VII. CONCLUSION

Based on the foregoing discussion, the undersigned recommends that the Court find the ALJ improperly determined Ms. Hatch to be not disabled, and therefore that the Court should reverse the ALJ's decision to deny benefits. The Court should also decide that a rehearing is not

REPORT AND RECOMMENDATION - 25

required, and a remand with directions to calculate the award of benefits is the correct remedy for the errors in this case.

The parties have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); Federal Rule of Civil Procedure (FRCP) 72(b); *see also* FRCP 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the above time limit, the Clerk shall set this matter for consideration on **May 4, 2018**, as noted in the caption.

DATED this 18th day of April, 2018.

Theresa L. Fricke
United States Magistrate Judge

REPORT AND RECOMMENDATION - 26